**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRYKO HOLDINGS, LLC, | : | |
| On behalf of itself and all others | : | No. 19cv906 |
| similarly situated, | : | |
| | : | Hon. John E. Jones III |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF HARRISBURG and | : | |
| MAYOR ERIC PAPENFUSE, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

### December 16, 2019

Plaintiff Tryko Holdings, LLC brought the above-captioned action on its own behalf and on behalf of all others similarly situated seeking declaratory and injunctive relief against Defendants the City of Harrisburg and its Mayor, Eric Papenfuse.  Presently pending before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint, (Doc. 1) (the "Motion").  (Doc. 8).  The Motion has been fully briefed, (Docs. 16, 19, 24), and is ripe for disposition.  For the reasons that follow, the Motion shall be granted.

# I.     BACKGROUND

In accordance with the standard of review applicable to a motion to dismiss, the following facts are derived from Plaintiff's complaint and viewed in the light most favorable to it.[1]

## A. The Incinerator Sale

Since 1972, the City of Harrisburg (the "City") owned an incinerator, which it had to close in 2003 due to environmental and fiscal challenges. (Doc. 19-1, at ¶ 22). The City attempted to retrofit the incinerator, but the contractor it had hired for the job went bankrupt. (*Id.*). The failed retrofitting project sunk the City into more than $300 million of debt. (*Id.* at ¶ 23). The City issued bonds to raise money, but it began missing payments in 2009. (*Id.* at ¶ 23). In 2010, Pennsylvania's Department of Community and Economic Development declared the City a "financially distressed municipality" under Act 47. (*Id.*).

In 2011, the Commonwealth of Pennsylvania produced a bailout plan for the City, which the Harrisburg City Council rejected. (*Id.* at ¶ 24). Ultimately, in 2012, the Commonwealth Court placed the City in receivership, (*id.* at ¶ 25), and the Receiver, General William E. Lynch, formulated the "Harrisburg Strong Plan" (the "Plan") to guide the City's financial recovery. (*Id.*). The Plan required the

---

[1]     Due to a formatting error, Plaintiff misnumbered the paragraphs of its initial Complaint, (Doc. 1). (Doc. 19 at 4 n.1). Plaintiff attached a correctly-numbered version of its Complaint to its brief in opposition. (Doc. 19-1). We cite the corrected version, (Doc. 19-1), herein for clarity.

City to sell its incinerator to the Lancaster County Solid Waste Management Authority ("Lancaster") for $129.9 million. (*Id.* at ¶ 26). As part of the arrangement, however, the City guaranteed to provide Lancaster with 35,000 tons of trash to process per year, for 20 years, at a cost of $190 per ton. (*Id.* at ¶¶ 26–27). In effect, the City committed to providing Lancaster with $133 million of debt service over 20 years. (*Id.*).

The incinerator sale precipitated two municipal actions relevant to the instant litigation. First, in July 2013, the Harrisburg City Council raised the City's waste collection and disposal rates to offset the City's debt service to Lancaster. (*Id.* at ¶ 29). The City promulgated its new waste collection rates in a document entitled "Commercial Volume Rate Effective April 1, 2015." (*Id.* at ¶ 33). Second, on February 9, 2015, the City's Mayor, Eric Papenfuse (the "Mayor"), announced in a letter to the City's businesses that the City—rather than private haulers—would assume all municipal waste and recycling collection duties within the City. (*Id.* at ¶¶ 30, 32). The Mayor's letter explained that the City would be doing so "as a result of the sale of the Harrisburg Incinerator to Lancaster County Solid Waste Authority[] and the trash volume requirements placed upon the City by the conditions of the sale . . . ." (*Id.* ¶ 31). The City then made agreements with private waste haulers to keep them from collecting waste within the City. (*Id.* at ¶ 37).

Plaintiff Tryko Holdings, LLC ("Tryko" or "Plaintiff"), owns and operates multifamily apartment buildings within the City. (*Id.* at ¶ 1). Prior to the Harrisburg City Council's waste collection and disposal rate increase and the Mayor's letter, Plaintiff had been paying a private hauler $2,200 per month to remove its trash. (*Id.* at ¶ 34). Under the new rates, Plaintiff's costs rose by 340% per month for assertedly-identical services. (*Id.* at ¶ 38). On January 14, 2018, the City ordered Plaintiff to cease using its private trash hauler and pay the increased rates. (*Id.* at ¶ 70).

## B. The Third-City Code and the City's Municipal Code

Under Pennsylvania law, the City of Harrisburg is considered a city of the third-class governed by Pennsylvania's Third-Class City Code. (*Id.* at ¶ 20). Relevant to the instant case, the Third-Class City Code provides that a third-class city's "[c]ouncil . . . may prohibit accumulations of ashes, garbage, solid waste and other refuse materials upon private property, including the imposition and collection of reasonable fees and charges for the collection, removal and disposal." (*Id.* at ¶ 21 (emphasis omitted) (quoting 11 Pa.C.S. § 12409(a) (2016))).

In accordance therewith, in 1992, the City adopted several provisions governing waste management in its own local municipal code,[2] (*see id.* at ¶ 43),

---

[2]     As further explained *infra*, throughout its Complaint, Plaintiff quotes and discusses various sections of the Harrisburg municipal code's waste management provisions in the present tense; however, these provisions were removed or amended on July 3, 2018. (*See* Doc. 19 at 9 ("On July 3, 2018, City Council with the consent of the mayor amended the Municipal Waste

including a requirement that the City segregate the funds it collected in connection with waste management services from its other funds. (Doc. 19-2, lns. 783–91; *see also* Doc. 19-1 at ¶ 44). Under its local municipal code, the City could use these segregated funds only to:

> [D]efray[] the expenses of the City in the operation, maintenance (including insurance), repair, alteration, inspection, and other ordinary expenses in relation to the disposal facility and for the making of usual renewals and replacements and ordinary improvements thereto in order to maintain adequate service, including any taxes lawfully imposed, payable by the City under other payment required to be paid under such lease or supplement.

(Doc. 19-2, lns. 785–91; Doc. 19-1 at ¶ 45).

In addition, the City's local municipal code provided that the City would collect all waste generated therein. (Doc. 19-2, lns. 418–23; *see also* Doc. 19-1 at ¶ 51). However, the same provision also empowered the Director of the Department of Public Works to exempt nonresidential properties from this general requirement. (Doc. 19-2, lns. 418–23; *see also* Doc. 19-1 at ¶ 51). The Director could do so based upon "the type, nature, or quantity of . . . [nonresidential] waste or the necessity of more frequent collection than provided by the City . . . ." (Doc. 19-2, lns. 419–21; *see also* Doc. 19-1 at ¶ 51). If granted an exemption, owners of nonresidential properties could contract with private waste haulers to provide waste management services instead of the City. (*See* Doc. 19-2, lns. 455–59; Doc.

---

and Recycling Code.")). Bill No. 3-2018, (Doc. 19-2), contains the relevant waste management provisions as they existed prior to the aformenetioned amendment.

19-1 at ¶ 53). Residential properties, including multifamily residential properties like the kind Plaintiff operated, were not given this allowance. (*See* Doc. 19-1 at ¶ 55, 57).

On July 3, 2018, the City amended the waste management portion of its local municipal code. (*See* Doc. 19-2; Doc. 19 at 9). The amended provisions allowed "commercial" properties to petition the Director to waive the requirement that the City collect and dispose of their waste thereby allowing them to utilize a private trash hauler. (Doc. 19-2, lns. 452–55l; *see also* Doc. 19 at 9). The amendment included within its definition of "commercial" any "apartment buildings with five or more individual domiciles . . . ." (Doc. 19-2, lns. 96–100; *see also* Doc. 19 at 9). The July 3, 2018 amendments also removed the section of the municipal code that limited the ways the City was permitted to use funds collected in connection with its waste program. (Doc. 19-2, lns. 782–91).

On May 28, 2019, Plaintiff filed a Complaint in this Court raising three primary issues. In Count I, Plaintiff avers that Defendants violated the Commerce Clause of the United States Constitution by prohibiting private waste haulers from collecting and disposing of waste within the City. (*Id.* at ¶ 73–74). Plaintiff seeks damages, attorneys' fees, and declaratory and injunctive relief under 42 U.S.C. §

1983 and § 1988.[3]  (*Id.* at ¶¶ 78–80).  In Count II, Plaintiff seeks a declaration that the City's increased rates for municipal waste collection and disposal services are unreasonable and thereby unlawful.  (*Id.* ¶ 86).  In Count II, Plaintiff also seeks equitable relief in the form of disgorgement.  (*Id.*).  In Count III, Plaintiff raises an equal protection challenge premised upon the City's failure to allow multifamily residential properties to request a waiver under its local municipal trash collection regime.  (*See id.* at ¶¶ 89–90).[4]  Plaintiff seeks damages, attorneys' fees, and declaratory and injunctive relief under 42 U.S.C. § 1983 and § 1988.  (*Id.* at ¶¶ 93–95).

Defendants filed a Motion to Dismiss on June 24, 2019, (Doc. 8), and a brief in support thereof on July 22, 2019.  (Doc. 16).  Plaintiff filed a brief in opposition on August 26, 2019.  (Doc 19).  Defendants filed a Reply on October 9, 2019.  (Doc. 24).  For the reasons that follow, Defendants' Motion shall be granted in part and denied in part.

---

[3]    Although Plaintiff's Complaint includes references to 42 U.S.C. § 1985 in Counts I and III, Plaintiff has withdrawn 42 U.S.C. § 1985 as a basis for its claims.  (Doc. 19 at 4 n.2).

[4]    Although titling Count III "Violation of Equal Protection Clause of the United States Constitution," and focusing upon the Equal Protection Clause therein, Plaintiff seems to reference in passing that Defendants also violated the Due Process Clause of the Fourteenth Amendment.  (Doc. 19-1 at ¶¶ 91–92).  In their motion, Defendants moved to dismiss Count III to the extent it is based upon the Fourteenth Amendment's Due Process Clause, yet Plaintiff did not respond to Defendants' arguments in its opposition brief.  Thus, we shall grant as unopposed Defendants' motion to dismiss Count III to the extent it relies upon the Due Process Clause of the Fourteenth Amendment and need not address it further herein.

## II. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint attacked by Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level . . . ." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 680. Next, the district court must identify "the 'nub' of the . . . complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.* Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the

merits." *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556–57). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## III.   DISCUSSION

In their motion and accompanying brief, Defendants seek to dismiss all three Counts in Plaintiff's Complaint. Defendants' arguments, however, do not neatly track the Counts in the Complaint. Accordingly, we address Defendants' arguments in the way we believe to be most efficient.

### A. Dormant Commerce Clause

In the first issue, Defendants move to dismiss for failure to state a claim Plaintiff's Commerce Clause claim outlined in Count I. Although Defendants concede that a law that facially discriminates between in-state and out-of-state trash haulers may violate the Commerce Clause, Defendants point out that Plaintiff has failed entirely to allege "how . . . private haulers and businesses are treated differently due to their state of origin" under the City's trash-hauling regime. (*Id.* at 14). Rather, Defendants reason, Plaintiff merely asserts that the City's policies "unnecessarily burden interstate commerce in violation of the Commerce Clause," (*Id.* (internal quotation marks omitted) (quoting Doc. 19 at 20)), which the United States Supreme Court has found insufficient to sustain a Commerce Clause

violation in the public—as opposed to private—trash hauling context. (Doc. 16 at 12–13 (citing *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007) (holding that a municipality does not violate the dormant Commerce Clause by monopolizing waste management)). We agree.

The Commerce Clause of the United States Constitution vests in Congress the power "[t]o regulate Commerce . . . among the several States." U.S. CONST. art. 1, § 8, cl. 3. Though the Commerce Clause does not appear to restrict "the several States," the Supreme Court has long recognized that the Commerce Clause contains a "dormant" element. *Dep't of Revenue v. Davis*, 553 U.S. 328, 337 (2008) (citations omitted). The so-called dormant Commerce Clause prohibits states from hampering interstate commerce by engaging in economic protectionism—insulating in-state economic interests from their out-of-state competitors. *Id.* at 337–38 (citations omitted).

There are two ways a state law may violate the dormant Commerce Clause. *See Leb. Farms Disposal, Inc. v. County of Lebanon*, 538 F.3d 241, 248–49 (3d Cir. 2008). First, a law may facially discriminate against interstate commerce; it does so if it treats in-state and out-of-state economic interests differently so as to benefit the former and burden the latter. *Id.* at 248 (citing *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007)). Laws that facially discriminate against interstate commerce must survive "rigorous scrutiny."

*Id.* at 246 (internal quotation marks omitted) (quoting *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 392 (1994)).  Second, a law that does not facially discriminate against interstate commerce may violate the dormant Commerce Clause if fails the balancing test established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  A law fails that test if it imposes a "burden . . . on [interstate] commerce" that "is clearly excessive in relation to the putative local benefits[.]"  *Id.* (citations omitted) (quoting *United Haulers*, 550 U.S. at 346).

The United States Supreme Court has decided two major dormant Commerce Clause cases in the area of waste management.  *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007); *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383 (1994).  In *Carbone*, the Court found that a municipal ordinance that "forced haulers to deliver waste to a particular *private* processing facility" facially discriminated against interstate commerce and held that the ordinance could not withstand rigorous scrutiny.  *United Haulers*, 550 U.S. at 334; *Leb. Farms Disposal, Inc. v. County of Lebanon*, 538 F.3d 241, 246 (3d Cir. 2008).  In *United Haulers*, however, the "majority distinguished *Carbone*'s rigorous scrutiny analysis as applying only to regulations that favor *private* waste disposal sites . . . ."  *Leb. Farms Disposal, Inc*, 538 F.3d at 249 (citing *United Haulers*, 550 U.S. at 342) (emphasis added).  The *United Haulers* Majority then held that ordinances that "require[d] haulers to bring waste to

facilities owned and operated by a state-created public benefit corporation" and treated in-state *private* interests the same as out-of-state *private* interests did "not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." *United Haulers*, 550 U.S. at 334, 345.

Here, Plaintiff does not allege that the City's restriction facially discriminates between in-state and out-of-state private waste haulers. (*See* Doc. 24 at 13 ("Plaintiff has not articulated how the present matter treats private businesses differently in terms of their in-state vs. [out-of-state] status.")). Rather, Plaintiff alleges, the City's requirement burdens *all* private waste haulers equally. Indeed, Plaintiff categorically avers that "the Mayor announced that the City would eliminate the use of private trash haulers for municipal trash and those services would now be *exclusively provided by the City, without choice*." (*Id.* at ¶ 5 (emphasis added)). Moreover, Plaintiff readily admits that the City's requirement is meant to serve a public purpose. That is, central to Plaintiff's Complaint is the notion that the City's requirement burdens private waste haulers as a means of furthering the City's end of repaying its debt service to Lancaster. (*See* Doc. 19-1 at ¶¶ 30–31). For these reasons, the City's requirement bears a closer resemblance to the facially neutral ordinances in *United Haulers* than to the facially discriminatory ordinance in *Carbone*. Thus, rather than apply rigorous scrutiny, we apply the *Pike* balancing test. *See Heffner v. Murphy*, 745 F.3d 56, 73 (3d Cir.

2014) (citing *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008))

(applying the *Pike* balancing test to a law that "does not discriminate against out of

state interests").

Under *Pike*, in order to state a plausible Commerce Clause violation in the

waste management context, a Plaintiff must plead sufficient facts which, if taken as

true, demonstrate that the City's waste management protocols impose a "burden . .

. on [interstate] commerce" that "is clearly excessive in relation to the putative

local benefits[.]" *Pike*, 397 U.S. at 137 (citations omitted) (quoting *United

Haulers*, 550 U.S. at 346); *see also Heffner*, 745 F.3d at 71 (citations omitted). In

its Complaint, Plaintiff readily concedes that the City's requirements advance at

least one benefit to the City and the local community: It helps the City collect a

sufficient volume of waste to fulfill its agreement with Lancaster. (Doc. 19-1 at ¶¶

30–31). Fulfilling its agreement with Lancaster is one element of a larger plan to

"balance the City's budget"—a plainly significant local benefit. (*Id.* at ¶ 39

(citation omitted)). On the other hand, Plaintiff's Complaint is devoid of any facts

demonstrating how the concurrent burden imposed upon interstate commerce by

the City's municipal waste regime "is clearly excessive in relation to" that benefit.

*Pike*, 397 U.S. at 137 (citations omitted) (quoting *United Haulers*, 550 U.S. at

346). Plaintiff asserts generally that "[t]he City's restrictions on trash removal

unnecessarily burden interstate commerce in violation of the Commerce Clause,"

(Doc. 19 at 20), which, at this stage of the litigation, we must disregard as a "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011)). Likewise, Plaintiff does not explain how the City's regime burdens *interstate* commerce because the City charges more for its trash hauling services than an in-state private trash hauler would. The same is also patently insufficient to demonstrate that said burden "is clearly excessive in relation to" the benefit it confers. In other words, Plaintiff has failed entirely to present any factual assertions in support of its Commerce Clause analysis and has failed to plead facts which, even if taken as true, are sufficient to state a plausible claim that the City's trash collected regime imposes burdens on interstate commerce that "clearly outweigh" the putative local benefits. *Heffer*, 745 F.3d at 77 (citing *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008)). Accordingly, we find that Plaintiff has failed to state a Commerce Clause violation and we shall grant Defendants' Motion as to Count I.

## B. Equal Protection Clause

In the next issue, Defendants argue that Count III must be dismissed because Plaintiff has failed state any facts which, if taken as true, demonstrate that the

City's municipal waste collection regime violated the Fourteenth Amendment's Equal Protection Clause. To reiterate, in its Complaint, Plaintiff contends that the "City has enacted and enforced the 'Municipal Waste and Recycling' code in a fashion that treats owners and operators of multifamily residential entities in an arbitrary and unreasonable fashion that has no substantial relationship to public health, safety, morals or general welfare." (Doc. 19-1 at ¶ 89). Specifically, Plaintiff complains, the City's waste collection laws allow "commercial" entities, but not "multifamily residential entities to seek, and obtain, the same waiver."[5] (*Id.* at ¶ 90).

---

[5]     The relevant provision of the City's local municipal code that Plaintiff challenges stated:

> All municipal waste generated in the City shall be collected by the City, except for municipal waste from nonresidential property when, because of the type, nature, or quantity of such waste or the necessity of more frequent collection than provided by the City, permission is granted by the Director [of the Department of Public Works], either by general rule or regulation, or, in specific cases, for such municipal waste to be collected by private haulers or by the occupiers of such nonresidential property.

(Doc. 19-2, lns. 418–23).

       As noted above, we discuss this ordinance in the past tense because the City amended its municipal waste management provisions on July 3, 2018. In so doing, the City altered the classification scheme and attendant waiver requirements that Plaintiff challenges in its Complaint. After the amendment, nonresidential properties *and* "apartment buildings with five or more individual domiciles"—like the kind Plaintiff operates—may seek a waiver from the requirement that the City collect their waste. (Doc. 19-2, lns. 96–100). The City's amendment raises the reasonable question of whether Plaintiff's Equal Protection Clause claim is moot, which would strip us of jurisdiction over that claim. See *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs*, Inc., 528 U.S. 167, 180 (2000)). Nonetheless, because our Supreme Court has cautioned that "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)

In their motion and accompanying brief, Defendants contend that Plaintiff's general averment that the City's distinction between residential and commercial properties has "no substantial relationship to public health, safety, morals or general welfare," (Doc. 19-1 at ¶ 89), is insufficient to overcome the clearly articulated rationale for the City's classification—*i.e.* the type, nature, or quantity of such waste or the necessity of more frequent collection differs between the various classes—when viewed through the lens of rational basis scrutiny. That is, according to Defendants, Plaintiff's arguments discount entirely the City's stated rationale for the residential-commercial classification and fails to consider that a government action survives rational basis review even if that action is an imperfect means of achieving the government's desired ends. (Doc. 24 at 16–17). Thus, Defendants reason, Plaintiff has failed to state an equal protection claim and Count III must be dismissed. We agree.

The Fourteenth Amendment prohibits a state from "deny[ing] . . . any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

(quoting *Friends of Earth, Inc.*, 528 U.S. at 189), because Defendants continue to defend the constitutionality of the municipal code provision that denied Plaintiff the opportunity to seek a waiver, (*see, e.g.*, Doc. 24 at 16 ("Plaintiff's real issue is that it falls within the residential category for refuse fees and because of that Plaintiff is unable to seek a waiver to use private trash services.")), and have made no assurance that the City will not return to denying multifamily residential properties the opportunity to seek waivers, (*see generally* Doc. 16 at 9–12; Doc. 24 at 14–20), and because Plaintiff alleges that the City amended the relevant municipal code provisions while the preceding state court litigation was ongoing and that the legal challenges before us "were the catalysts for this change in the law," (Doc. 19 at 9), out of an abundance of caution, we shall rule upon the merits of Plaintiff's Equal Protection Clause claim.

A state or municipality implicates the Equal Protection Clause when it creates a classification, but courts do not view all classifications with equal scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citations omitted); *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013). "In reviewing an ordinance that does not burden a fundamental right or target a suspect class, we are to uphold its constitutionality if it bears a rational relation to some legitimate end." *Ramsgate Court Townhome Ass'n v. W. Chester Borough*, 313 F.3d 157, 160 (3d Cir. 2002) (citing *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). Such an ordinance is entitled to a presumption of validity. *Connelly*, 706 F.3d at 216 (citations omitted). Moreover, "[i]n our evaluation of whether a state action is rationally related to a legitimate state interest, we are 'free to consider any conceivable . . . purpose' and 'are not limited to considering only the goal stated by the' state actor." *Id.* (quoting *Ramsgate*, 313 F.3d at 160).

Here, the parties agree that the rational-basis test is the appropriate lens through which to consider Plaintiff's claim because the relevant municipal code provision does not implicate a suspect class or a fundamental right. (Doc. 16 at 9; Doc. 19 at 17); *see Ramsgate*, 313 F.3d at 160 (applying the rational basis test to a waste management ordinance that distinguished between types of properties). Thus, we presume the City's ordinance to be valid and to survive a motion to dismiss for failure to state a claim, Plaintiff must allege sufficient facts

demonstrating that the City's municipal waste classification regime is not rationally related to any legitimate government interest. Plaintiff has failed to do so. In its Complaint and in its brief in opposition to the instant motion to dismiss, Plaintiff's arguments necessarily concede that the City's distinction between commercial and residential entities stems from the different ways in which those entities operate and the resulting waste management protocols each requires. (*See* Doc. 19 at 17; Doc. 19-1 at 55; *see also* Doc. 24 at 18 ("[Nonresidential] properties . . . may have different types of waste (*i.e.* medical, toxic, etc.) that could affect disposal costs and how often waste needs to be collected.") (emphasis omitted); Doc. 24 at 17–18 ("[Nonresidential] properties typically produce more refuse and/or refuse that requires more resources to collect than residential properties, which includes multi-family dwellings."). At bottom, Plaintiff's equal protection claim is premised upon the City's alleged failure to include multifamily residential properties within the definition of commercial. (*Id.*). In other words, Plaintiff admits that the distinction between commercial and residential properties is rational and appropriate but insists that multifamily residential units are more like commercial properties than residential properties and should thus be afforded the opportunity to seek a waiver under the local ordinance. This is not a proper basis for an equal protection claim.

In so contending, Plaintiff has plainly failed to consider that, under rational basis scrutiny, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (quoting *F.C.C. v. Beach Commc'ns, Inc*., 508 U.S. 307, 315 (1993)). "'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Id*. (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Id*. (internal quotation marks omitted).

In our view, Plaintiff's arguments amount to no more than an attempt to second-guess an otherwise rational—albeit assertedly unnecessary or even illogical—classification and is, therefore, insufficient to state a claim for relief under the Fourteenth Amendment's Equal Protection Clause. We note: "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Id*. (quoting *Metropolis Theatre Co. v. Chicago,* 228 U.S. 61, 69–70 (1913)). Plaintiff's disagreement with the City's classification regime is insufficient to render the classification constitutionally infirm and we shall grant Defendants' Motion as to Count III.

## C. Declaratory Judgment

In the next issue, Defendants challenge Plaintiff's entitlement to the declaratory judgment it requests in Count II. In Count II, Plaintiff seeks a declaration under Fed.R.Civ.P. 57 and 28 U.S.C. § 2201 that:

> [T]he City is not entitled to collect refuse fees from Class members when it could not provide service; that the City is prohibited from continuing to charge unreasonable municipal trash collection and disposal fees; as well as equitable relief in the form of disgorgement of any fees and/or fines it received for periods when it was incapable of providing service and those fees charged in excess of what was reasonably necessary to collect and dispose of municipal refuse.

(Doc. 19-1 at ¶ 86).

In their motion and accompanying brief, Defendants argue that, because Plaintiff challenges several municipal actions which necessarily resulted from the Harrisburg Strong Plan—a plan which the Commonwealth Court later approved—this Court should decline to exercise supplemental jurisdiction over Plaintiff's request for a declaratory judgment because the claim amounts to a collateral attack on the Commonwealth Court's order. Indeed, Defendants continue, the Commonwealth Court explicitly retained jurisdiction over the Plan and the implementation thereof. (Doc. 16 at 14–22). Moreover, Defendants reason, although afforded every opportunity to object to the Harrisburg Strong Plan, Plaintiff failed to do so and should not be entitled to do so now. (*Id.*).

In response, Plaintiff clarifies that it is not challenging the Commonwealth Court's approval of the Plan, (Doc. 19 at 20), but rather the City's waste-management rates and procedures that flowed therefrom.  Specifically, Plaintiff clarifies that, in its view, the waste management provisions of the City's local municipal code violate the Third-Class City Code, a Pennsylvania statute which requires that all fees associated with municipal waste collection be "reasonable." (*Id.*; *see also* Doc. 19-1 at ¶¶ 37–39).  According to Plaintiff, Defendants—and not the Harrisburg Strong Plan or the Commonwealth Court—set the new rates, prohibited private waste haulers from competing, and used waste-management funds to support the City's general welfare.  (*Id.* at 21).  Thus, Plaintiff concludes, this Court has jurisdiction over its declaratory judgment action and Count II need not be dismissed.

Although the parties fundamentally disagree whether challenging Defendants' actions in connection with the incinerator sale collaterally attacks the Commonwealth Court's determination that the Harrisburg Strong Plan was sound, (*see* Doc. 24 at 22–23), or whether Defendant's actions violate the Third-City Code, (*see* Doc. 19-1 at ¶¶ 37–39), at this stage in the proceedings, we need not enter that debate.  Rather, because we shall dismiss Counts I and II for failure to state a claim and because Plaintiff's request for a declaratory judgment in Count II involves only state law, *see Exxon Corp. v. Hunt*, 683 F.2d 69, 73 (3d Cir.1982)

("[A] declaratory judgment complaint does not state a cause of action arising under federal law when the federal issue is in the nature of a defense to a state law claim."); *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989) ("[Plaintiff] cites in its complaint the Declaratory Judgment Act, 28 U.S.C. § 2201, as a basis for jurisdiction. But this Act only creates a remedy and is not an independent basis for jurisdiction."), we shall decline to exercise supplemental jurisdiction thereover.  28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").  Judicial economy dictates that there is no significant interest served by adjudicating these claims in federal court at this time and, because the Court lacks an independent basis to retain jurisdiction over the remaining state-law claims, we shall dismiss Plaintiff's Complaint in its entirety.

## IV.   CONCLUSION

In accordance with the foregoing, we shall grant Defendants' Motion to Dismiss.  (Doc. 8).  An appropriate Order shall issue.